UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHANIE D. TAYLOR,

               Plaintiff,                        Civil Action No. 12-cv-12855

     v.                                  District Judge Arthur J. Tarnow
                                          Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [9] AND**
**DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12]**

For about sixteen years, Plaintiff Stephanie Taylor worked as a repair person for the Detroit Water and Sewerage Department. (Dkt. 7, Transcript ("Tr.") 281.) In March 2008, she attempted to pull a "tapper" out of the mud and injured her lower back and left arm. (Tr. 281.) A physician would later opine that her physical injuries disabled her from work (at least for a time). (Tr. 267.) Taylor also suffered from depression and anxiety after the work incident, and a psychiatrist and psychologist have each opined that Taylor's mental impairments preclude her from performing a number of basic work-related tasks. (*See* Tr. 353-357, 359-63.) Because of her physical and mental impairments, Taylor applied for disability insurance benefits and supplemental security income. (*See* Tr. 44.) The Social Security Administration denied Taylor's applications. (*See* Dkt. 1, Compl.)

Taylor now appeals that decision. (Dkt. 1, Compl.) She alleges that in denying her applications, Defendant Commissioner of Social Security ("Commissioner") did not properly consider her mental impairments. (*See generally* Dkt. 9, Pl.'s Mot. Summ. J.) The Commissioner

disagrees. (*See generally*, Dkt. 12, Def.'s Mot. Summ. J.)  The parties' cross-motions for summary judgment have been referred to this Court for a report and recommendation. (Dkt. 3.)  This Court has studied the briefs and the administrative record, and has concluded that the certain findings by the Administrative Law Judge lack explanation necessary for this Court to determine whether substantial evidence supports them.  For this reason and those set forth below, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 9) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 12) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I.  BACKGROUND

### A.  Procedural History

On May 30, 2008, Taylor applied for disability insurance benefits ("DIB"). (Tr. 44.)  On November 20, 2008 she filed an application for supplemental security income ("SSI"). (Tr. 44.)  In both applications she asserted that she became unable to work on March 28, 2008. (*Id.*)  The Social Security Administration initially denied Taylor's applications on April 29, 2009. (*Id.*)  Taylor then requested an administrative hearing, and on April 6, 2010, she testified before Administrative Law Judge Theodore W. Grippo, who considered her case *de novo*.   (Tr. 16-36; 44-56.)  In an August 26, 2010 decision, ALJ Grippo found that Taylor was not disabled. (*See* Tr. 44-56.)  His decision became the final decision of the Commissioner of Social Security on May 10, 2012 when the Social Security Administration's Appeals Council denied Taylor's request for review. (Tr. 1.)  Taylor filed this suit on June 28, 2012. (Dkt. 1, Compl.)

**B. Medical Evidence**

    *1. Dr. Robert Cornette's Treatment Notes*

Taylor saw Robert Cornette, Ph. D., a licensed psychologist (*see* Tr. 238), for psychotherapy from May 2008 to November 2009. (*See* Tr. 235, 336.) During this approximately year-and-a-half period, Taylor had 38 sessions with Dr. Cornette. (*See* Tr. 235-262, 336-47.) Through November 2008, Taylor saw Dr. Cornette on a weekly basis. (*See* Tr. 235-262.) She then did not see Dr. Cornette in December 2008, and beginning in January 2009, her sessions were infrequent, about one per month. (*See* Tr. 336-47.)

    Although the handwritten portions of Dr. Cornette's therapy notes are largely illegible, he consistently used a typewritten form to record some of Taylor's subjective complaints and, apparently, almost all of his objective observations. (*See, e.g.*, Tr. 238.) (It appears that the handwritten portion of his notes consist primarily of Taylor's reporting of life events and her feelings about those experiences. (*See, e.g.*, Tr. 238.))

    At her first visit with Dr. Cornette in May 2008, Taylor reported feeling very depressed. (Tr. 233.) Dr. Cornette noted that Taylor's affect was flat, worrisome, and sad, and that her mood was depressed and anxious. (Tr. 234.) He provided that Taylor's recent memory and concentration were impaired. (*Id.*) Dr. Cornette diagnosed Taylor with a Diagnostic and Statistical Manual of Mental Disorders code 296.33 (Tr. 236): "major depressive disorder, recurrent, severe, without psychotic features," American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders*, 860 (4th ed., Text Revision 2000) (capitalization altered). He assigned Taylor a low Global Assessment

Functioning score of 40.  (Tr. 236.)[1]

Throughout her treatment with Dr. Cornette, Taylor regularly reported that her energy, concentration, social interaction, and activity levels ranged from "poor" to "moderate" (as opposed to "good").  (Tr. 235-262, 336-47.)  At times she reported that there was "no change" in her depression and anxiety (*e.g.*, Tr. 241-46, 257-59), but other times she reported feeling "less depressed" or "less anxious" (*e.g.*, Tr. 247-48, 260, 339).

Dr. Cornette's recorded "objective observations" were also largely consistent throughout the course of treatment.  At virtually all of the sessions, Dr. Cornette believed Taylor to be depressed, anxious, distractible, rambling, and fatigued.  (*See* Tr. 235-262, 336-47.)  At half (or more) of the sessions, Dr. Cornette also observed Taylor to be blunt and tearful.  (*See id.*)  Less frequently, Dr. Cornette noted that Taylor was preoccupied, suspicious, and angry.  (*See id.*)

On February 10, 2010, Dr. Cornette opined on Taylor's functional limitations.  (Tr. 359-63.)  His diagnoses remained the same as in May 2008: major depression, recurrent and severe.  (Tr. 359.)  Dr. Cornette also assigned a similar GAF score of 42.  (*Id.*)  In a section of the form asking for "clinical findings," Dr. Cornette provided the results of a mental-status exam.  (Tr. 359.)  Taylor could recall four digits forward and three backward, recall two objects after three minutes,

---

[1]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000).  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id.* at 32.

A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *DSM-IV* at 34.

apparently could complete "3 of 9" in the "serial sevens" test (a concentration-related test requiring repeat subtraction of 7 starting from 100).  (Tr. 359.)  From a long list of possible symptoms, Dr. Cornette's selections included difficulty thinking or concentrating, psychomotor retardation, short and intermediate memory impairment, and loss of intellectual ability of at least 15 intelligent-quotient points.  (Tr. 360.)  He explained that Taylor had reduced intellectual functioning because of attention and memory deficits which, in turn, were attributable to her depression and anxiety.  (Tr. 362.)  Functionally, Dr. Cornette opined that Taylor was unable to perform a number of "unskilled" tasks "on a sustained basis in a regular work setting": remembering work-like procedures, maintaining attention for a two-hour segment, responding appropriately to changes in a routine work setting, and dealing with normal work stress.  (Tr. 361.)  Dr. Cornette also believed that Taylor could not "maintain regular attendance and be punctual within customary, usually strict tolerances" and could not complete a normal workday (or workweek) without interruptions from psychologically based symptoms.  (*Id.*)  He further opined that Taylor was unable to maintain "persistence, performance, and pace in a work or work-like setting."  (Tr. 362.)  Dr. Cornette thought that Taylor had suffered these limitations since March 27, 2008.  (Tr. 363.)

### 2.  Dr. Leon Rubenfaer's Treatment Notes

Taylor's therapy with Dr. Cornette was largely concurrent with medical treatment from Dr. Leon Rubenfaer, a psychiatrist.  She began seeing Dr. Rubenfaer in June 2008 and her treatment concluded around December 2009.  (*See* Tr. 231, 349.)  Taylor saw Dr. Rubenfaer seven times over this year-and-a-half period.  (*See* Tr. 228-31, 349-51, 353-57.)

In June 2008, Taylor told Dr. Rubenfaer that it had been difficult for her to deal with stress associated with her work injury.  (Tr. 231.)  Taylor felt frustrated and depressed.  (*Id.*)  Taylor also

5

reported, in Dr. Rubenfaer's words, "feel[ing] devastated since [her] workman's compensation [claim had been] denied." (*Id.*) His diagnosis was major depression caused by Taylor's workplace injury. (*Id.*) Dr. Rubenfaer noted, "totally disabled, see Dr. Cornette." (*Id.*) He prescribed 50mg of Zoloft to Taylor. (*Id.*)

In July 2008, Dr. Rubenfaer noted that Taylor had a "very depressed affect" and was "sad, tearful." (Tr. 230.) He continued Taylor or Zoloft, 50mg. (*Id.*)

The next month, Dr. Rubenfaer noted that Taylor was "sad [and] depressed," irritable, upset, and experiencing psychomotor retardation. (Tr. 229.)

In October 2008, Taylor told Dr. Rubenfaer that she felt like her life was over, that she was always in pain, and that she could not concentrate. (Tr. 228.) Dr. Rubenfaer's objective findings included sleep deprivation, difficulty concentrating, poor memory, psychomotor retardation, and slow speech. (*Id.*) He also noted that Taylor had "crazy thoughts" during the interview. (*Id.*) Although his handwriting is difficult to decipher, it appears that Dr. Rubenfaer prescribed Seroquel and increased Taylor's Zoloft prescription to 100 mg. (*Id.*)

Taylor did not return to Dr. Rubenfaer for seven months. (*See* Tr. 228, 351.) In June 2009, Dr. Rubenfaer provided that Taylor had a depressed affect and angry spells. (Tr. 351.) He also noted that Taylor was "very slow" and "sleeping in pain." (*Id.*) Dr. Rubenfaer diagnosed major depression and post-traumatic stress disorder (apparently attributable to her work injury). (*Id.*) He discontinued Seroquel and prescribed Abilify, Xanax, and Zoloft (at 100 mg). (*Id.*)

Taylor next saw Dr. Rubenfaer about five months later, in November 2009. (Tr. 350.) Taylor reported that she was receiving disability, that her house was in foreclosure, and that there had been a death in her family. (*Id.*) Dr. Rubenfaer prescribed Zoloft at 50 mg and Xanax. (*Id.*)

In December 2009, Dr. Rubenfaer opined that Taylor was "totally disabled." (Tr. 349.) His diagnoses were PTSD, major depression, and chronic pain, all attributable to Taylor's March 2008 work injury. (Tr. 349.) Dr. Rubenfaer prescribed Zoloft 50 mg, Xanax, and, apparently, Ambien. (Tr. 349.)

On February 8, 2010, two days before Dr. Cornette completed his functional assessment, Dr. Rubenfaer opined on Taylor's symptoms and limitations using an identical form. (Tr. 353-357.) When asked to describe his clinical findings, Dr. Rubenfaer provided "panic attacks, severe anxiety, mood swings, difficulty with memory, no motivation." (Tr. 353.) Among the list of symptoms, Dr. Rubenfaer's selections included difficultly thinking or concentrating, psychomotor agitation or retardation, and illogical thinking. (Tr. 354.) Functionally, Dr. Rubenfaer opined that Taylor was not able to perform a number of "unskilled" tasks "on a sustained basis in a regular work setting": remembering work-like procedures, carrying out very short and simple instructions, maintaining attention for a two-hour segment, responding appropriately to changes in a routine work setting, and dealing with normal work stress. (Tr. 355.) Like Dr. Cornette, Dr. Rubenfaer believed that Taylor's limitations had existed since her work injury in March 2008. (Tr. 357.)

### 3. Opinions from Michigan's Disability Determination Service

In the spring of 2009, Michigan's Disability Determination Service evaluated Taylor for the Social Security Administration. (Tr. 289-92.) In February 2009, Dr. M. Dibai, a psychiatrist, performed a consultative examination. (Tr. 292.) Taylor reported difficulty sleeping, weight gain, and being worried about everything. (Tr. 289.) She explained that her medication had not provided much relief. (Tr. 290.) Dr. Dibai noted that during his interview of Taylor, "her attitude was superficially cooperative, she was guarded, evasive and it was difficult to extract information and

history from her, as she delayed responses or evaded answering." (Tr. 290.) He found that Taylor had low self-esteem, and mild psychomotor retardation. (Tr. 291.) Taylor responded to questions "monosyllabically with delayed reaction time" and her "thought process was slowed." (*Id.*) Dr. Dibai provided that Taylor "presented cognitive impairment manifested by preoccupation, inattentiveness and inability to concentrate[] properly through most of the interview." (*Id.*) Plaintiff was unable to perform the "serial sevens" test, and when asked to perform serial threes starting from 20, she stated "19, 18." (Tr. 291.) Dr. Dibai diagnosed Taylor with depressive disorder, pain disorder, and paranoid personality disorder. (Tr. 292.) He assigned her a GAF of 30, and summarized,

> On the basis of the history and clinical findings at the time of the interview, the patient appeared to be able to grasp, understand, remember instructions instantly although with hesitancy. She presented cognitive impairment manifested with sustaining attention span and concentration for extended periods of time but appeared to be trusting relationship and hyper-vigilant, suspicious attitude toward questions, which defensively guarded herself, failed to provide specific information, at this point she did not appear to establish trusting relationship[s] with people, coworkers and adapt to changes in the work setting.

(Tr. 292.)

In March 2009, F. Kladder, Ph. D., reviewed Taylor's medical file, including Dr. Dibai's consultative evaluation notes, and, based solely on this file review, completed a Psychiatric Review Technique form ("PRTF") and a mental residual functional capacity form for the Social Security Administration. (Tr. 294-307, 308-11.) On the PRTF, Dr. Kladder provided that Taylor had "mild" restrictions in activities of daily living, "moderate" difficulties in maintaining social functioning, and "moderate" difficulties in maintaining concentration persistence, or pace. (Tr. 304.) On the mental residual functional capacity form, Dr. Kladder provided that Taylor was moderately limited

8

in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions form psychologically based symptoms; get along with coworkers or peers; and respond to changes in the work setting. (Tr. 308-09.) Dr. Kladder otherwise provided that Taylor was "not significantly limited." (*Id.*) Dr. Kladder also remarked, "Based on the totality of the evidence in file, [the claimant] is able to perform routine tasks that are non complex." (Tr. 310.)

In April 2009, Marva Dawkins, Ph.D., a medical consultant for the Social Security Administration, completed forms indicating that she agreed with Dr. Kladder's assessments. (Tr. 328-32.)

### C. Testimony at the Hearing Before the ALJ

#### 1. *Plaintiff's Testimony*

Taylor testified to her mental impairments at her administrative hearing before ALJ Grippo. She explained that she was "depressed most of the time," had crying spells, and could not do "little tasks" because her concentration was "off." (Tr. 21.) She explained that she would start but not finish tasks. (Tr. 21.) She also provided, "[m]y memory's been off a lot lately." (*Id.*) When asked to elaborate, Taylor explained, "[I'm] supposed to do something, and I know I'm supposed to do it and I set out to do it. Then I forget. Like my appointments. I've missed doctor's appointments because of it." (Tr. 22.) When the ALJ asked about Taylor's ability to interact with others, Taylor explained, "I'm suspicious of people now. I used to be a very outgoing person, but I'm not anymore." (Tr. 25.) In response to a line of questioning regarding her worker's compensation settlement, Taylor explained that she had a bank account in her name but that her daughter managed her money. (Tr. 29.)

### 2.  *The Vocational Expert's Testimony*

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for a hypothetical individual of Taylor's age (then 52), education (tenth grade), and work experience who was capable of a reduced range of light work, and more importantly for this appeal, was limited to "doing simple, routine work with only brief, special contact with coworkers, supervisors, and the general public."  (Tr. 32.)  The VE testified that, based on how Taylor described her prior jobs, the hypothetical individual could perform Taylor's past work as a park maintenance helper and road laborer.  (Tr. 32; *see also* Tr. 31.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'"  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

10

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Grippo found that Taylor had not engaged in substantial gainful activity since the alleged disability onset date of March 28, 2008. (Tr. 46.) At step two, he found that Taylor had the following severe impairments: status post traumatic sprain and strain and a mood disorder. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 47-48.) Between steps three and four, the ALJ determined that Taylor had the residual functional capacity to perform, as relevant here, "simple work with only superficial contact with co-workers." (Tr. 48.) At step four, the ALJ found that Taylor was capable of performing her past work as a park maintenance worker or road maintenance worker. (Tr. 55.) The ALJ therefore concluded that Taylor was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision, August 26, 2010. (Tr. 56.)

## III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole.  *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.

2001).   There is no requirement, however, that either the ALJ or this Court discuss every piece of

evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th

Cir. 2006).   Further, this Court does "not try the case de novo, resolve conflicts in evidence, or

decide questions of credibility."  *Bass*, 499 F.3d at 509;  *Rogers*, 486 F.3d at 247.

## IV.  ANALYSIS

Plaintiff asserts that the Commissioner's decision should be reversed or remanded for three

reasons.  First, says Plaintiff, "[s]ubstantial evidence does not support the ALJ's conclusion that

Plaintiff's conditions and limitations do not meet or medically equal Listing 12.04 for affective

disorders."  (Pl.'s Mot. Summ. J. at 12.)  This step-three argument has a procedural aspect too:

Plaintiff says that the ALJ's step-three analysis is so lacking, that she (and this Court) cannot tell

why he believed that her limitations did not meet or medically equal Listing 12.04.  (Pl.'s Mot.

Summ. J. at 12, 14; *see also* Dkt. 13, Pl.'s Resp. to Def.'s Mot. Summ. J. at 1-2.)  Second, Plaintiff

argues that the ALJ erred in evaluating Dr. Cornette's and Dr. Rubenfaer's opinions.  (Pl.'s Mot.

Summ. J. at 14-19.)  Third, Plaintiff makes an argument that this Court has addressed on prior

occasions but hopes to clarify in this case: that the ALJ erred because he found that Plaintiff had

"moderate" limitations in concentration, persistence, or pace, yet failed to include specific,

corresponding limitations in his hypothetical to the VE or in his residual functional capacity

assessment.  (Pl.'s Mot. Summ. J. at 19-20.)

Likely following the order set forth in the five-step analytical framework, Plaintiff leads with

her step-three argument.  (Pl.'s Mot. Summ. J. at 12-14.)  The Commissioner did the same.  (Def.'s

Mot. Summ. J. at 7-10.)  But if Plaintiff is correct that the ALJ should have credited the opinions

of Drs. Cornette and Rubenfaer, then the ALJ would have to revisit his step-three analysis as the two

treating-source opinions lend substantial support to Plaintiff's claim that her mental impairments

satisfy Listing 12.04.  The Court therefore begins with Plaintiff's second claim of error.

### A.  Plaintiff Has Not Shown That the ALJ Violated the Treating-Physician Rule in Evaluating the Opinions of Dr. Rubenfaer and Dr. Cornette

The treating-source rule generally requires an ALJ to give deference to the opinion of a

claimant's treating source.  In particular, "[a]n ALJ must give the opinion of a treating source

controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and

laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the]

case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting former

20 C.F.R. § 404.1527(d)(2), now § 404.1527(c)(2)); *see also* S.S.R. 96-2p, 1996 WL 374188 (1996).

And where an ALJ finds that a treating physician's opinion is not entitled to controlling weight,

"'there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is

entitled to great deference.'"  *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (quoting *Rogers*,

486 F.3d at 242).  In this non-controlling weight situation, an ALJ must consider and apply the

following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the

length of the treatment relationship and the frequency of examination," (2) "the nature and extent

of the treatment relationship," (3) the relevant evidence presented by a treating physician to support

his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization

of the treating source."  20 C.F.R. § 404.1527(c)(2).  In addition, the treating-source rule contains

a procedural, explanatory requirement: an ALJ's narrative must contain "good reasons" for the

weight he assigns to a treating-source opinion.  *See e.g.*, *Wilson*, 378 F.3d at 544; *see also* S.S.R.

96-2p, 1996 WL 374188, at *5 (providing that a decision denying benefits "must contain specific

reasons for the weight given to the treating source's medical opinion, supported by the evidence in

the case record").

Plaintiff maintains that the ALJ erred in giving less than controlling weight to the opinions of Dr. Cornette and Dr. Rubenfaer.  (Pl.'s Mot. Summ. J. at 14-19.)  The Court tends to agree with Plaintiff that their opinions should have been assigned more than "little weight."  But this Court does not perform *de novo* review of an ALJ's decision.  Under the deferential standard that governs, this Court cannot say that Plaintiff has shown reversible error.

### 1. The ALJ's Analysis of Dr. Rubenfaer's Opinion Was Reasonable

The ALJ assigned Dr. Rubenfaer's February 2010 opinion "little weight."  (Tr. 53-54.)  In reaching this conclusion, ALJ Grippo reasoned this way:

> While he is considered a treating source physician, the undersigned give[s] Dr. Rubenfaer's opinion little weight for the reasons that follow.  Dr. Rubenfaer stated in the residual functional capacity questionnaire that he saw the claimant every month, yet the record shows that he actually saw the claimant just 7 times over the course of 20 months.  (See 2F; 15F).  In addition, the record shows that approximately four months elapsed between the date of the last visit and the date Dr. Rubenfaer rendered his opinion.  (15F at 2; 16F at 2-6).  Dr. Rubenfaer's opinion is internally inconsistent in that he opined the claimant was unable to follow even very short simple instructions, yet was fully capable of managing benefit funds in her own best interest.  (*Id.*).  Dr. Rubenfaer's opinion is also inconsistent with the fact that he prescribed the claimant psychotropic medications at or below the lowest therapeutic levels.  (16F at 2).  Furthermore, the diagnoses, signs, symptoms, and opinion statement of Dr. Rubenfaer are inconsistent with those of Dr. Cornette, even though the two collaborated on the claimant's care.  In sum, while he is considered a treating source physician, Dr. Rubenfaer's opinion is inconsistent with the record as a whole and deserves little weight in this case.

(Tr. 53-54.)

The Court agrees with Plaintiff that not all of these are "good" reasons for giving Dr. Rubenfaer's opinion "little weight."  For one, as Plaintiff points out, Dr. Rubenfaer's opinion is

more consistent with Dr. Cornette's opinion than it is inconsistent: both found that Plaintiff was incapable of performing the vast majority of the listed unskilled tasks in a work setting. (*Compare* Tr. 355 *with* Tr. 361.)  As Plaintiff also points out, although he did not offer any functional limitations, Dr. Dibai assigned a low GAF score and recognized that Plaintiff had a cognitive impairment; both findings lend support to Dr. Rubenfaer's opinion.  Further, the Court notes that while Dr. Rubenfaer's treatment notes consist primarily of Plaintiff's self-reported symptoms, Plaintiff is correct that Dr. Rubenfaer did make some observations that are in accord with some of the limitations in his February 2010 opinion.  For example, in October 2008, Dr. Rubenfaer noted sleep deprivation, difficulty concentrating, poor memory, psychomotor retardation, and slow speech. (Tr. 228.)  And in his February 2010 opinion, he provided that Plaintiff suffered from psychomotor agitation or retardation, sleep disturbance, and difficulty thinking or concentrating. (Tr. 354.) Given the foregoing, substantial evidence may very well support giving Dr. Rubenfaer's opinion great weight.

But the operative question is not whether a preponderance of the evidence supports giving Dr. Rubenfaer's opinion more weight than what the ALJ assigned.  Rather, the appropriate inquiry is whether substantial evidence, more than scintilla but less than preponderance, *Rogers*, 486 F.3d at 241, supports the ALJ's decision to give Dr. Rubenfaer's opinion "little weight."  While the ALJ's reasons for discounting Dr. Rubenfaer's opinion are not all "good" ones, the Court believes that substantial evidence does support a number of them and that, collectively, those reasons suffice to justify his decision to assign the opinion "little" weight.

First, the ALJ was correct that Dr. Rubenfaer wrongly stated that he saw Plaintiff on a monthly basis.  He in fact only treated Plaintiff seven times between June 2008 and February 2010

16

(when he authored his opinion).  (Tr. 54, 228-31, 349-51, 353-57.)  This fact supports two related inferences, neither of which are favorable to Dr. Rubenfaer: he did not see Plaintiff very often and he overstated his treatment relationship with Plaintiff.  Second, the ALJ also correctly identified an inconsistency (albeit, not a large one) within Dr. Rubenfaer's opinion: he provided that Taylor was unable to, on a sustained basis in a work setting, carry out "very" short and simple instructions, ask simple questions or request assistance, and remember work-like procedures, yet, he also found that Taylor was capable of managing her benefits in her own best interest.  (Tr. 355, 357.)  Third, as the ALJ also noted, Dr. Kladder, albeit only a file-review physician, opined that Plaintiff could perform the mental and emotional demands associated with unskilled work.  (Tr. 55, 308-10.)

If these were the only reasons for assigning Dr. Rubenfaer's opinion "little" weight, the Court might not recommend affirming the ALJ's treating-source analysis.  The ALJ, however, provided a stronger reason for discounting Dr. Rubenfaer's opinion: it was not consistent with Plaintiff's course of treatment.  (Tr. 54; *see also* Tr. 51 ("The undersigned has considered the objective medical evidence and treatment history.  The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual.").)  First, ALJ Grippo reasoned that Plaintiff's medication dosage was not consistent with someone whose depression and anxiety were so severe that they are unable to perform the vast majority of simple work-related tasks.  (*See* Tr. 54.)  Plaintiff does not challenge the factual underpinnings of this finding on appeal to this Court; instead Plaintiff asserts that the ALJ impermissibly "played doctor."  (Pl.'s Mot. Summ. J. at 16.)  But, as the Commissioner correctly points out, the ALJ had a duty to consider the "type, dosage, [and] effectiveness" of Plaintiff's medications in determining whether her allegations of pain were credible.  (Def.'s Mot. Summ. J. at 12); 20 C.F.R. §§ 404.1529(c)(3)(iv).  It therefore

17

seems reasonable for the ALJ to have made a like consideration in evaluating Dr. Rubenfaer's credibility.

Second, the ALJ also reasonably found that Plaintiff's other treatment was not consistent with Dr. Rubenfaer's very limiting opinion. (*See* Tr. 51, 53-54.) Beginning at the end of 2008, Plaintiff began seeing Dr. Cornette only on a monthly basis. Further, from October 2008 through the date of Dr. Rubenfaer's opinion, Plaintiff only saw Dr. Rubenfaer three times. Nothing has been provided to the Court that contradicts the ALJ's implication that one therapy session per month and one medication review every four or five months, was treatment inconsistent with someone whose depression and anxiety prevented performance of almost all of the unskilled tasks that Dr. Rubenfaer identified. The ALJ also reasoned that soon after Plaintiff received her worker's compensation benefits in late 2009, she discontinued treatment with Drs. Cornette and Rubenfaer altogether. (Tr. 50, 52.) Plaintiff has not challenged this factual finding on appeal, and offers no other explanation for her mental-health treatment coming to an abrupt halt. *See Policoro v. Comm'r of Soc. Sec.*, No. 1:09-CV-71, 2010 WL 3779910, at *5-6 (W.D. Mich. Mar. 22, 2010) ("The ALJ's finding was based, in part, on plaintiff's failure to seek regular and more intensive mental health care . . . . The ALJ applied the well-established general rule that a claimant's failure to seek treatment over an extended period of time is a factor to be considered against the claimant's assertion of a disabling condition."), *report and recommendation adopted*, 2010 WL 3779543 (W.D. Mich. Sept. 22, 2010).

In sum, the inferences the ALJ drew from the record may not be the ones this Court would draw if it were deciding this case *de novo*. But that is not this Court's role. There is substantial evidentiary support for the ALJ's reasons for discounting Dr. Rubenfaer's opinion, and a reasonable person could assign Dr. Rubenfaer's opinion "little" weight for many of the same reasons that led

18

2:12-cv-12855-AJT-LJM   Doc # 14   Filed 04/26/13   Pg 19 of 37   Pg ID 477

ALJ Grippo to do so.  As such, while close, Plaintiff has not shown that the ALJ reversibly erred in evaluating Dr. Rubenfaer's opinion.

Plaintiff's alternative, procedural argument presents less difficulty.  She argues that even if substantial evidence supports the weight the ALJ assigned to Dr. Rubenfaer's opinion, the ALJ erred by failing to discuss each of the factors listed in 20 C.F.R. § 404.1527(c).  The Court is not aware of any binding authority requiring an ALJ to explicitly *discuss* (as opposed to consider) each such factor.  *See Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (providing that, before rejecting a treating-source opinion, an ALJ must "*conduct* the balancing of factors to determine what weight should be accorded these treating source opinions" (emphasis added)); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir.2009) ("If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by *considering* a number of factors . . . ." (emphasis added)).  And there is persuasive authority to the contrary.  *Francis v. Comm'r Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011); *Klimas v. Comm'r of Soc. Sec.*, No. 1:10-666, 2012 WL 691702, at *1 (W.D. Mich. Mar.1, 2012); *Paseka v. Comm'r of Soc. Sec.*, No. 1:09-1073, 2011 WL 883701, at * 1-2 (W.D. Mich. Mar. 11, 2011).

In any event, this Court believes that the ALJ did discuss each of the 20 C.F.R. § 404.1527(c) factors.  The ALJ remarked upon the length, frequency, and nature of Plaintiff's treating relationship with Dr. Rubenfaer.  (Tr. 53-54); 20 C.F.R. § 404.1527(c)(2).  He noted whether Dr. Rubenfaer explained his opinion and supported it with his treatment notes or other medical evidence.  (Tr. 53-54); 20 C.F.R. § 404.1527(c)(3).  The ALJ noted that Dr. Rubenfaer was a psychiatrist.  (Tr. 53); 20 C.F.R. § 404.1527(c)(5).  And, although this Court might disagree with the outcome, the ALJ did comment on the consistency of Dr. Rubenfaer's opinion with the other evidence of record, including

19

the other medical opinions.  (Tr. 54); 20 C.F.R. § 404.1527(c)(4).  In short, ALJ Grippo explained

everything that he was required to.  Plaintiff's procedural argument does not warrant remand.

### 2.  The ALJ's Analysis of Dr. Cornette's Opinion Was Reasonable

The ALJ also assigned Dr. Cornette's opinion "little" weight.  (Tr. 54.)  In so doing, he

reasoned as follows:

> Although he is considered a treating source physician, the record
> shows that the claimant's treatment with Dr. Cornette ended about
> three months prior to the date of the opinion statement.  The record
> and hearing testimony establish that the claimant did not seek further
> psychiatric treatment from Dr. Cornette, Dr. Rubenfaer, or any other
> physician after settlement of her workers compensation case. Dr.
> [Cornette's] opinion is internally inconsistent in that he opined the
> claimant was unable to understand and remember short simple
> instructions, yet was fully capable of managing benefit funds in her
> own best interest.  (*Id.* at 4-6).  Furthermore, the diagnoses, signs,
> symptoms and opinion statement of Dr. Cornette are inconsistent
> with those of Dr. Rubenfaer, even though the two collaborated on the
> claimant's care.  Dr. Cornette's opinion is also inconsistent with the
> fact that his treatment of the claimant decreased from weekly to
> monthly appointments well before the date of the opinion.  Overall,
> Dr. Cornette's opinion is inconsistent with the record as a whole and
> is given little weight.

(Tr. 54.)  Essentially then, the ALJ's reasons for discounting Dr. Cornette's opinions were similar

to those for discounting Dr. Rubenfaer's.

It follows that Plaintiff's contentions for why the ALJ erred in discounting Dr. Cornette's

opinion are similar to her arguments pertaining to Dr. Rubenfaer.  (*Compare* Pl.'s Mot. Summ. J.

at 14-17 *with id.* 17-18.)  Namely, Plaintiff claims that Dr. Cornette's observations, as recorded in

his treatment notes, in fact support his opinion.  (Pl.'s Mot. Summ. J. at 17.)  Plaintiff also argues

that Dr. Cornette's opinion is consistent with Dr. Rubenfaer's and Dr. Dibai's.  (Pl.'s Mot. Summ.

J. at 18.)

As with Dr. Rubenfaer's opinion, the Court agrees with Plaintiff that substantial evidence may support giving Dr. Cornette's opinion great weight. But, as this Court reasoned with respect to Dr. Rubenfaer's opinion, the ALJ gave reasons, supported by substantial evidence, that adequately justify giving Dr. Cornette's February 2010 opinion "little" weight. Principally, the ALJ reasonably concluded that Plaintiff's course of treatment with Dr. Cornette — reducing from weekly to monthly and then none at all — runs contrary to his opinion providing that Plaintiff was incapable of performing an overwhelming majority of unskilled tasks in a work environment. The ALJ's other rationales, such as Plaintiff's low medication dosage and Dr. Kladder's opinion, provide additional support for his decision to discount Dr. Cornette's opinion. In all, Plaintiff has not persuaded the Court that the ALJ reversibly erred in assigning Dr. Cornette's opinion "little" weight.

Plaintiff has also not shown that the ALJ failed to adequately explain how he evaluated Dr. Cornette's opinion. (Pl.'s Mot. Summ. J. at 18-19.) As with Dr. Rubenfaer, the ALJ discussed the length and frequency of the treatment (Tr. 52) and the consistency of Dr. Cornette's opinion with other evidence of record (Tr. 54). He noted that Dr. Cornette was a psychologist (Tr. 54) and that Dr. Cornette's notes did not support at least one finding in his opinion (Tr. 54). Plaintiff may disagree with how the ALJ weighed the 20 C.F.R. § 404.1527(c) factors, but the ALJ's narrative reflects that they were considered. The Court therefore finds no violation of the procedural aspect of the treating-source rule.

**B.  The ALJ's Reasons for Assigning Plaintiff "Moderate" Limitations in the "B" Criteria Are Not Supported by Substantial Evidence and, therefore, Remand for Further Explanation Is Necessary**

Having determined that Plaintiff has not shown that the ALJ unreasonably weighed the opinions of Drs. Rubenfaer and Cornette, the Court now turns to Plaintiff's claim that the ALJ erred at step three of the five-step disability analysis.  (Pl.'s Mot. Summ. J. at 12-14.)  At step three, an ALJ is to determine whether a claimant's impairments meet or medically equal one of the impairments in the Social Security "Listings" found at 20 C.F.R. pt. 404, subpt. P, app. 1.  Plaintiff asserts that substantial evidence does not support the ALJ's conclusion that she did not satisfy three of the "B" criteria requirements associated with Listing 12.04 for affective disorders: activities of daily living, social functioning, and concentration, persistence, or pace.  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04.  (Pl.'s Mot. Summ. J. at 12.)

In finding that Plaintiff had only "moderate" limitations in activities of daily living, social functioning, and concentration, persistence, or pace, the ALJ provided what appears to be a rather robust list of activities:

> In the Function Report, the claimant reported being able to do the following: live in a house with family; watch television; prepare simple meals such as sandwiches; perform most personal care tasks with assistance; attend doctor appointments; go to the store with her daughter; drive and ride in a car; and attend church services.  (6E at 3-10).  The claimant further stated that she needed reminders regarding personal care tasks and medications but was able to travel outside the home alone.  (*Id.* at 4).  Although she stated that she was able to drive and ride in a car, the claimant indicated that she needed to use a motorized cart when shopping at stores. (*Id.* at 6).  In terms of social functioning, the claimant reported that she respected authority figures and had no problem getting along with family, friends, neighbors, and other people.  (*Id.* at 8-9).
>
> The Third Party Function Report submitted by the claimant's daughter is generally consistent with the statements made by the

22

> claimant in her Function Report. (4E). At the hearing, the claimant testified that she has a bank account in her name with a substantial amount of money in it from settlement of her workers' compensation case.
>
> The above evidence supports a finding of moderate limitation in activities of daily living, social functioning, and concentration, persistence or pace, as well as no episodes of extended decompensation.

(Tr. 47-48.)

The Court has reviewed the function reports relied upon by the ALJ, and finds that they read quite differently than the ALJ portrayed them. Plaintiff's daughter provided that Plaintiff did no cooking. (Tr. 156.) And no chores. (*Id.*) She also provided that Plaintiff's sole hobby or interest was "watching T.V." (Tr. 158.) She also explicitly stated that Plaintiff did not have "any" social activities. (Tr. 159.) In terms of church, Plaintiff's daughter qualified that Plaintiff would go "sometimes[,] when she's up for doing it." (Tr. 158.) As for shopping, she provided that Plaintiff went only one to three times per month. (Tr. 157.) And, as the ALJ recognized, Plaintiff's self-completed function report, although less articulate, is entirely in accord with her daughter's. (Tr. 50; *compare* Tr. 154-61 *with* 174-81.)

The ALJ's reliance on Plaintiff's testimony that she held a bank account in her own name was also misplaced. Plaintiff's testimony speaks more to her inability to function than her ability to do so:

> [ALJ:] So you have a bank account?
> A Yes.
> Q Do you manage that bank account?
> *A My daughter does.*
> *Q You don't manage that money?*
> *A No.*
> Q In whose name is the account?
> A It's in my name.

(Tr. 29 (emphasis added).)  Both of the function reports relied upon by the ALJ corroborate this testimony: they provide that Plaintiff's daughter manages Plaintiff's money for her.  (Tr. 157, 177.)

Thus, none of the reasons provided by the ALJ — the activities listed in the two function reports and Plaintiff's testimony about her bank account — constitute substantial evidence to support his B criteria ratings.  This is not to say that the record may not contain substantial evidentiary support for those findings.  But it is to say that the ALJ has breached his duty to identify such support and provide a reasoned explanation to Plaintiff and this Court.  *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (noting that an "ALJ's decision still must say enough 'to allow the appellate court to trace the path of his reasoning.'" (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)); *Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) (noting that an "'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.'" (quoting *Diaz*, 55 F.3d at 306)); *Grandchamp v. Comm'r of Soc. Sec.*, No. 09-10282, 2010 WL 1064144, at *10 (E.D. Mich. Jan. 25, 2010) *report adopted in relevant part by* 2010 WL 1064138 (E.D. Mich. Mar. 22, 2010) ("'While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision.  Most importantly he must build an accurate and logical bridge from the evidence to his conclusion.'" (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *cf. Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) ("In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.").  Because the ALJ's current narrative is not

24

supported by substantial evidence, this Court recommends remand.

The Court recognizes that in *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 650 (6th Cir. 2009) the Sixth Circuit held that where an ALJ fails to rate a claimant's B criteria, a court may review the record and rate those criteria on its own to determine if the ALJ's omission was harmless. *Id.* at 655-58. But to the extent that the Commissioner would argue that this Court perform that task here, the Court would decline that invitation. Although permitting a court to complete an ALJ's step-three analysis to determine harmless error, the Sixth Circuit was explicit that a court should exercise "caution" in doing so:

> [I]n some cases it may be difficult, or even impossible, to assess whether an ALJ's failure to rate the B criteria was harmless. In such cases, the record may contain conflicting or inconclusive evidence relating to the B criteria. Or it may contain evidence favorable to the claimant that the ALJ simply failed to acknowledge or consider. As a result, courts generally should exercise caution in conducting harmless error review in this context. In this case, though, we are satisfied from our review of the record that the ALJ's failure to rate the B criteria was indeed harmless.

*Id.* at 657-58; *see also Marok v. Astrue*, No. 5:08CV1832, 2010 WL 2294056, at *8-9 (N.D. Ohio June 3, 2010) ("[C]ourts apply a harmless error analysis cautiously, taking care to avoid rewriting an ALJ's decision post hoc even when substantial evidence exists to support the ALJ's decision"); *Juarez v. Astrue*, No. 2:09-cv-160, 2010 WL 743739, at *5-6 (E.D. Tenn. Mar. 1, 2010) ("[T]o read *Rabbers* as the Commissioner proposes would immunize an ALJ's decision from review whenever the ALJ could have found on the record that the claimant was not disabled. Instead, *Rabbers* holds that an error is harmless only when 'concrete factual and medical evidence' is 'apparent in the record' and shows that even if the ALJ had made the required findings, the ALJ *would have* found the claimant not disabled. *Rabbers*, 582 F.3d at 657-58. . . . This is no trivial distinction, but goes

25

to the very heart of administrative adjudication.  If the reviewing court were permitted to affirm any outcome that could have been supported by the evidence, it would propel the court into the domain which Congress has set aside exclusively for the administrative agency." (some quotations marks and alterations omitted)).

Here, the Court believes that the record "contain[s] conflicting or inconclusive evidence relating to the B criteria," *Rabbers*, 582 F.3d at 657, such that the ALJ, rather than this court, should be the first to competently explain how the record, taken as a whole, does (or does not) support "moderate" limitations in activities of daily living, social functioning, and concentration, persistence, or pace.  On the one hand, Plaintiff's very limited activities as reported in the two function reports do not directly support her claim that she has more than "moderate" limitations in the B criteria: Plaintiff suffered from physical impairments, and her severely reduced activity was in part attributable to those impairments.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04 (requiring the medically documented depressive or bipolar syndrome to be the cause of marked limitations in activities of daily living, social functioning, or concentration, persistence, or pace).  Further, the Court has determined that the ALJ reasonably assigned Dr. Rubenfaer's and Dr. Cornette's functional limitations limited weight.  Further still, the ALJ assigned "great weight" to Dr. Kladder's opinion, and Dr. Kladder's B criteria ratings support the ALJ's.  (Tr. 304.)  On the other hand, it is clear that the ALJ did not adopt Dr. Kladder's B criteria ratings as the ALJ found that Plaintiff had "moderate" restrictions in activities of daily living while Dr. Kladder rated Plaintiff's restrictions in this criterion as "mild."  (Tr. 48.)  Further, even though the ALJ reasonably discounted Dr. Rubenfaer's and Dr. Cornette's opinions about the severity of Plaintiff's limitations, it remains that their treatment notes catalog limitations in social functioning and concentration, persistence, or pace.

26

(*See* Tr. 235-262, 336-47 (finding Plaintiff to be "distractible" at 35 sessions, "preoccupied" at 11 sessions, "rambling" at 32 sessions, "angry" at six sessions, and "suspicious" at seven sessions); Tr. 229-31 (finding Plaintiff to be "irritable" and exhibit "psychomotor retardation," "slow speech," and "poor memory").)  Additionally, two mental-status exams in the record, conducted by two different mental-health professionals, revealed difficulties in social functioning and concentration, persistence, or pace.  Dr. Cornette found that, on a test of concentration, 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00 C.3, Plaintiff could only complete "3 of 9 serial sevens," (Tr. 359).  And Dr. Dibai found that Plaintiff presented "pervasive feelings of mistrust and hesitancy to relate to interviewer," that her "immediate memory was impaired," and that "[i]n the process of performing serial [3s] from 20, she started with 19, 18."  (Tr. 291.)  The foregoing is sufficient to show that the evidence pertaining to the B criteria is not so one-sided that it would be prudent for this Court to reconcile under the guise of harmless error review.

### C. The ALJ Has Not Adequately Explained How Plaintiff's "Moderate" Difficulties in Concentration, Persistence, or Pace is Fully Accounted for by Limiting Plaintiff to "Simple Work"

At step three of the five-step disability analysis, the ALJ concluded that Plaintiff had "moderate" limitations in maintaining concentration, persistence, or pace ("CPP") (Tr. 47-48), i.e., that Plaintiff was moderately limited in his "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings," 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.00(C)(3).  But, when formulating a residual functional capacity assessment and corresponding hypothetical for the vocational expert, the ALJ did not include CPP-specific limitations (e.g., "no fast-paced production work").  (Tr. 32, 48.)  Rather, the ALJ merely limited Plaintiff to "simple work with only superficial contact with

co-workers." (Tr. 48.) Plaintiff says that the ALJ's omission is contrary to his step-three finding of "moderate" CPP difficulties and constitutes reversible error. (Pl.'s Mot. Summ. J. at 19-20.)

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010); *accord Varley v. Sec'y Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Regarding the specific claim that an ALJ's residual functional capacity assessment and corresponding hypothetical do not accurately portray a claimant's "moderate" difficulties in concentration, persistence, or pace, this Court has acknowledged that merely limiting a claimant to "unskilled work" may not be sufficient because "the difficulty of a task does not always equate with the difficulty of staying on task." *Taylor v. Comm'r of Soc. Sec.*, No. 10-CV-12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011) (Michelson, M.J.) *report and recommendation adopted*, 2011 WL 2682892 (E.D. Mich. July 11, 2011) (Edmunds, J.). Or, as well-stated by another court, "'There seem[s] to be two components to having moderate problems in concentration. One deals with the frequency of how often one cannot concentrate. The other deals with the level of sophistication or intensity of the work that can be done with the concentration limitation.'" *Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842, 846 (E.D. Mich. 2007) (quoting magistrate judge's report and recommendation).

Believing, however, that *Ealy* and *Varley* teach that the ultimate question is whether substantial evidence supports the ALJ's choice of limitations in the residual functional capacity assessment and corresponding hypothetical, this Court previously reasoned that "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled

work' but excludes a moderate limitation in concentration." *Taylor*, 2011 WL 2682682, at *7 *report and recommendation adopted*, 2011 WL 2682892; *see also Greer v. Comm'r of Soc. Sec.*, No. 11-CV-10330, 2012 WL 1060077, at *3 (E.D. Mich. Mar. 29, 2012) ("[T]he inquiry is whether a hypothetical question that accounts for the claimant's mental impairments with only an 'unskilled work' limitation sufficiently accounts for the full extent of the claimant's mental limitations."); *Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005) ("To be sure, all of the ALJ's findings, including those summarized on a [Psychiatric Review Technique form ("PRTF")], must be harmonized and incorporated into the hypothetical questioning of the VE. Yet, a particular assessment on a PRTF does not mandate a rigid checklist of restrictions that must be included in this questioning. Rather, a case-by-case determination is required, under which the ALJ must translate the broad PRTF classifications into a set of specific limitations that are properly rooted in the administrative record."); *cf. Smith v. Halter*, 307 F.3d 377, 378-79 (6th Cir. 2001) (holding, where ALJ made a finding that the plaintiff "often" has difficulties in CPP, that the ALJ did not need to include talismanic language in his hypothetical, at least where the evidence demonstrated that the claimant's concentrational difficulties were negligible and ALJ limited the claimant to "routine and low stress" jobs that did not involve "high quotas").

The Court recognizes that some cases suggest something of a categorical rule. These cases are, apparently, premised on the belief that a typical claimant with "moderate" limitations in concentration, persistence, or pace will be off task or behind pace even when performing "unskilled work" or "simple, routine tasks." *See Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009) ("It is difficult to reasonably accept 'moderate' meaning anything less than 20%–30% of the time at work. Thus, 'moderate' concentration problems, even

29

if not severe enough under the regulations to meet the listing of impairments for a finding of disability at Step 3 of the Commissioner's sequential evaluation, need to be included or accommodated in some suitable fashion in the hypothetical question at Step 5 of that sequence. Simply including the hypothetical of unskilled jobs with limited contact with co-workers and the public is not sufficient."). These cases also appear to find that it would be inconsistent for an ALJ to, on the one hand, conduct an independent review of the administrative record and find that a claimant has "moderate" deficiencies in CPP, yet, on the other hand, exclude CPP-specific limitations from his RFC assessment and corresponding hypothetical.

For example, in *Allen v. Comm'r of Soc. Sec.*, No. 09-13503, 2010 WL 3905983 (E.D. Mich. June 2, 2010) *report and recommendation adopted*, 2010 WL 3905194 (E.D. Mich. Sept. 30, 2010), the magistrate judge noted that the administrative record, "reviewed in its entirety, might suggest that substantial evidence would support the conclusion that Plaintiff experienced only mild or non-existent concentrational problems." *Id.* at *5. The problem, however, was that the ALJ found that the claimant experienced moderate deficiencies in CPP. *Id.* And the ALJ "made no reference whatsoever to concentrational limitations in the hypothetical question." *Id.* Instead, the ALJ only included a limitation to "unskilled work." *Id.* at *6. Thus, the magistrate judge found that the "VE's job findings, made in response to an incomplete set of [hypothetical] limitations (by the ALJ's own account) [did] not constitute substantial evidence." *Id.* The district judge adopted the report and recommendation and similarly reasoned, "a review of the record reveals that despite the ALJ's own findings, the VE's opinion about the scope of jobs available to Allen was based on an incomplete set of limitations." *Allen*, 2010 WL 3905194, at *3 (E.D. Mich. Sept. 30, 2010); *see also Brown v. Comm'r of Soc. Sec.*, 672 F. Supp. 2d 794, 797 (E.D. Mich. 2009) (finding unpersuasive that "none

of [Plaintiff's] medical or psychological treating sources suggested that Plaintiff lacked the concentration to perform unskilled one and two step work," where ALJ found that claimant had "moderate[]" CPP limitations but then only limited claimant to "simple, routine, repetitive, one or two step tasks"); *Benton*, 511 F. Supp. 2d at 846-49 (acknowledging that magistrate judge had found that "the administrative record lack[ed] objective medical findings or treatment records that would support a finding of impairment in concentration," but nonetheless remanding because (1) the ALJ found that claimant had "moderate" limitations in CPP based on claimant's medication,[2] (2) the ALJ's hypothetical only limited claimant to "simple, routine, repetitive work," and (3) the VE testified that many of the simple, routine jobs he had identified would not tolerate more than a 10% reduction in performance).

Notably, however, some courts have rejected the claim that an ALJ errs by omitting a CPP-specific limitation — at least where the basis for this argument is a physician's finding of "moderate" limitations in CPP, yet the same physician opines that the claimant is capable of unskilled tasks on a sustained basis.  In other words, some courts have focused on the consistency of the plaintiff's argument: a plaintiff may not argue for a selective incorporation of a medical opinion to demonstrate that the ALJ erred in excluding a CPP-specific limitation.

*Lewicki v. Comm'r of Soc. Sec.* is representative.  No. 09-11844, 2010 WL 3907049 (E.D. Mich. Aug. 23, 2010) *report and recommendation adopted*, 2010 WL 3905375 (E.D. Mich. Sept. 30, 2010).  There, the evidence suggested that the claimant did not suffer from significant mental

---

[2]In *Benton*, the claimant's attorney "provided the VE with a hypothetical claimant who is on task 75% of the time and off task 25% of the time because they are either in pain, in the back room putting their legs up, or 'goofing off.'"  511 F. Supp. 2d at 846-47.  But it appears that the ALJ did not conclude that the claimant had moderate limitations in CPP for these reasons.  *See id.* at 846.

impairments. *Id.* at *9 (claimant told consultative psychologist that he had not had panic attacks for "a while" and that his depression was mild). But a state-agency file-review psychologist nonetheless found that the claimant had "moderate" limitations in CPP. *Id.* The same psychologist, however, "concluded that plaintiff may work better in a low stress environment, but retained the ability to do unskilled tasks on a sustained basis." *Id.* Given a record that indicated that the claimant's mental impairments were limited, and the state-agency physician's ultimate conclusion, the magistrate judge believed that substantial evidence supported the hypothetical of "simple, routine work" even though the ALJ, perhaps tracking the state-agency opinion, had found that the claimant had "moderate" limitations in CPP. *Id.* The district judge agreed: "Plaintiff's objection ignores a particularly compelling piece of evidence provided by the same state psychologist who diagnosed Plaintiff's mental limitations in the first place. The psychologist diagnosed moderate mental impairments, but also concluded that Plaintiff's mental limitations would not prohibit him from performing simple, unskilled work." *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010); *see also Sutherlin v. Comm'r of Soc. Sec.*, No. 10-10540, 2011 WL 500212, at *2-3 (E.D. Mich. Feb. 8, 2011) (finding that substantial evidence supported a hypothetical limiting the claimant to "one to two-step tasks on a sustained basis" despite ALJ's finding that the claimant had "moderate" CPP problems where state-agency physician opined that claimant's moderate CPP problems "did not interfere with his ability to perform tasks that were simple in nature" and that claimant "retained the ability to perform 'one to two' step tasks on a sustained basis."); *Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *7-8 (E.D. Mich. June 16, 2008) ("Having adopted Dr. Marshall's discrete finding that Plaintiff experienced moderate limitations, the ALJ also reasonably adopted Dr. Marshall's more detailed conclusion as to the

Plaintiff's functional capacity for work, forming the basis for both the hypothetical question and RFC . . . .  Plaintiff's argument for the selective adoption of Dr. Marshall's 'moderate' limitations without considering his ultimate conclusion would amount to a distortion of the record."); *cf. Young v. Comm'r of Soc. Sec.*, No. 10-11329, 2011 WL 2601014, at *10 (E.D. Mich. May 23, 2011) ("Although Plaintiff correctly cites the moderate limitations[3] noted in the [state-agency] assessment, Plaintiff fails to mention that the same assessment also concluded that Plaintiff is 'capable of unskilled work.' . . .  In addition, another examiner also concluded that '[t]here is nothing presented that would socially or psychologically prevent Mr. Young from seeking, obtaining, and maintaining gainful employment.' . . .  I therefore suggest that the ALJ's hypothetical is nonetheless supported by substantial evidence."), *report and recommendation adopted*, 2011 WL 2600599 (E.D. Mich. June 30, 2011).

In sum, some cases seem to suggest that it is almost always inconsistent for an ALJ to find that a claimant has "moderate" limitations in CPP while, at the same time, excluding CPP-specific language in the residual functional capacity assessment.  *See, e.g.*, *Allen*, 2010 WL 3905983 at *5-6; *Brown*, 672 F. Supp. 2d at 797; *Green*, 2009 WL 2365557, at *10.  The underlying reasoning, apparently, is that claimants with "moderate" CPP limitations typically have difficulty staying on task or keeping pace even when performing "unskilled" or "simple, routine" work.  Other decisions have recognized that limiting a claimant to "unskilled" work or "simple, routine" tasks may be sufficient to account for the claimant's "moderate" limitations in CPP because at least some

---

[3]The state-agency physician in *Young* found that "Young was 'moderately limited' in 'the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.'"  2011 WL 2601014, at *10.

claimants with those limitations can stay on task and keep pace when the work is simple. *See Sutherlin*, 2011 WL 500212, at *2-3; *Lewicki*, 2010 WL 3905375, at *3; *Hess*, 2008 WL 2478325, at *7-8. In support of this theory are medical evaluations that rate a claimant's CPP limitations as moderate while nonetheless concluding that the claimant can perform unskilled work on a sustained basis.

Given the absence of a uniform, categorical rule, ALJs would greatly aid reviewing courts by explaining why they are assigning claimants a "moderate" limitation in CPP, and — more importantly — why the mental-capacity limitations (e.g., "unskilled" work) in the residual functional capacity assessment and corresponding hypothetical fully account for that moderate rating.

Here, as already discussed, the ALJ did not provide any supportable reasons for assigning Plaintiff "moderate" limitations in CPP at step three. In addition, the ALJ did not explain how he reconciled this finding with hypothetical and residual functional capacity assessment limitations of "simple work." The absence of explanation makes it unnecessarily difficult for this Court to determine whether this case is more similar to *Allen*, *Brown*, and *Green* or *Sutherlin*, *Lewicki*, and *Hess*. In short, the ALJ's narrative on this issue does not allow this Court "'to trace the path of his reasoning.'" *Stacey*, 451 F. App'x at 519 (quoting *Diaz*, 55 F.3d at 306).

The Commissioner implies that no further explanation is necessary and asserts that this case is akin to the latter group of cases. (Def.'s Mot. Summ. J. at 13-15.) The Commissioner says it is apparent that the ALJ adopted the opinion of Dr. Kladder, and points out that Dr. Kladder found a "moderate" limitation in CPP, but also concluded that Plaintiff could "perform routine tasks that are non complex." (*See id.* (citing Tr. 304, 310).) But the ALJ did not make any mention of Dr. Kladder at step three. Indeed, as discussed, the ALJ's finding that Plaintiff had "moderate"

limitations in CPP appears to be based on his own, independent review of the two function reports in the record. Strengthening this inference is that the ALJ's step-three B criteria ratings do not track Dr. Kladder's: the ALJ found that Plaintiff had "moderate" restrictions in activities of daily living (Tr. 47-48) whereas Dr. Kladder found that Plaintiff had only "mild" limitations in that criterion (Tr. 304). Moreover, as already discussed, Dr. Rubenfaer's and Dr. Cornette's notes indicate CPP problems. Thus, even recognizing that the ALJ gave Dr. Kladder's opinion "great weight" (Tr. 55), it is not clear how the ALJ reconciled this evidence, his step-three finding that Plaintiff had "moderate" limitations in CPP, and a hypothetical and RFC assessment that only limits Plaintiff to "simple work."

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ (1) has not adequately explained his B criteria ratings at step three of the five-step disability process, and (2) has not adequately explained how Plaintiff's "moderate" limitations in concentration, persistence, or pace are fully accounted for by a hypothetical and a residual functional capacity assessment that limits Plaintiff to "simple work," but omits concentration-, persistence-, or pace-specific limitations. This failure-to-articulate deprives this Court of a record that permits efficient, and, more importantly, accurate substantial evidence review. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (noting that an "ALJ's decision still must say enough 'to allow the appellate court to trace the path of his reasoning.'" (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)); *Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) (noting that an "'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.'"

(quoting *Diaz*, 55 F.3d at 306)).  This Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 9) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 12) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson                        
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  April 26, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 26, 2013.

s/Jane Johnson
Deputy Clerk